**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

JESSE LEE GARRETT,
ADC #656385                                                                                           PLAINTIFF

4:12CV00230-JLH-JTK

SGT. ANDREWS, et al.                                                                            DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATIONS

## INSTRUCTIONS

The following recommended disposition has been sent to United States District Judge J. Leon Holmes. Any party may serve and file written objections to this recommendation. Objections should be specific and should include the factual or legal basis for the objection. If the objection is to a factual finding, specifically identify that finding and the evidence that supports your objection. An original and one copy of your objections must be received in the office of the United States District Court Clerk no later than fourteen (14) days from the date of the findings and recommendations. The copy will be furnished to the opposing party. Failure to file timely objections may result in waiver of the right to appeal questions of fact.

If you are objecting to the recommendation and also desire to submit new, different, or additional evidence, and to have a hearing for this purpose before the District Judge, you must, at the same time that you file your written objections, include the following:

1. Why the record made before the Magistrate Judge is inadequate.

2. Why the evidence proffered at the hearing before the District Judge (if such a hearing is granted) was not offered at the hearing before the Magistrate Judge.

3.     The detail of any testimony desired to be introduced at the hearing before the District Judge in the form of an offer of proof, and a copy, or the original, of any documentary or other non-testimonial evidence desired to be introduced at the hearing before the District Judge.

From this submission, the District Judge will determine the necessity for an additional evidentiary hearing, either before the Magistrate Judge or before the District Judge.

Mail your objections and "Statement of Necessity" to:

> Clerk, United States District Court
> Eastern District of Arkansas
> 600 West Capitol Avenue, Suite A149
> Little Rock, AR 72201-3325

## **DISPOSITION**

An evidentiary hearing was held in this case before the Court on August 21, 2013. Following a presentation of the testimonies of the parties and witnesses, and submission of exhibits, the Court enters the following Proposed Findings and Recommended Disposition.

**I.     Introduction**

Plaintiff Jesse Lee Garrett is a state inmate currently incarcerated at the Cummins Unit of the Arkansas Department of Correction (ADC). He filed this action pro se, pursuant to 42 U.S.C. § 1983, alleging failure to protect and excessive force by Defendants while he was incarcerated at the Faulkner County Detention Center (Jail) in March, 2012, as a pretrial detainee. All Defendants except Defendant Michael Hardy were dismissed from this action by Order dated January 8, 2013 (Doc. No. 86). Plaintiff asks for monetary relief from Defendant Hardy.

**II.    Factual Findings**

    **A.     Hearing Testimony and Exhibits**

        **1.     Plaintiff Jesse Garrett**

While incarcerated at the Jail, Plaintiff Garrett experienced several instances of suicidal thoughts and actions. On March 12, 2012, he notified Officers Darrell Flowers, Kervin Hinton, and Michael Hardy that he felt suicidal. When they arrived in his cell, Hardy looked around the cell and the other pods and started to leave, but Plaintiff stopped Hinton and told him he was having bad thoughts. Hardy asked, "what did he say," placed his hand on his taser, and approached Plaintiff. Plaintiff backed up and repeated that he was thinking about hurting himself. Hardy told him to pack his property, which caused Plaintiff to believe he intended to take him to "the hole," which he did not understand. Hinton then cuffed Plaintiff and escorted him to the elevator. While on the elevator, Hardy asked Plaintiff what his problem was, and Plaintiff responded, "what's your problem?" Hardy stated he did not have time for this and as they exited the elevator, Hardy pushed Plaintiff. Plaintiff turned and said, "did you just push me?" and Hardy asked him what he would do about it. Plaintiff asked him why he was doing this, stating "I'm not the one that's f___ing your wife." Hardy grabbed Plaintiff by the collar and twice slammed him into the glass window in the booking area of the Jail. Plaintiff complained he was hurting him, and stated that everyone in the Jail knew of his shoulder problems. When Plaintiff asked Hinton why Hardy did that, Hinton responded that he did not know. The officers then took Plaintiff back upstairs and placed him in a padded cell, which "freaked out" the Plaintiff, because normally suicide watch involves cuffing an inmate to the bench in the first-floor booking area, where he can be seen at all times. After banging his head against the door of the cell, the officers again removed him and took him back downstairs and placed him in a restraint chair. Plaintiff told the officers to call the nurse and she later told them that he had shoulder problems. The nurse treated Plaintiff while he was in the restraint chair for cuts on his head caused by the banging on the cell door, and provided him with ibuprofen.

Plaintiff alleges that Hardy failed to properly document the incident and changed the reports filed by the other officers, thereby violating Jail policies. He also alleges that Hardy similarly slammed him into a window or door on a previous occasion at the Jail.

### 2. John Randall

Mr. Randall is a Major at the Jail, and formerly was in charge of internal affairs. He conducted an investigation into this incident, following the filing of a grievance by Plaintiff Garrett. (This occurred after an initial investigation into Plaintiff's grievance by correctional officers Gary Andrews and Brianne Pickard. Pickard wrote a report following that investigation, finding no evidence of excessive force.) He met with Garrett and interviewed witnesses, and found discrepancies in the reports filed by the officers involved. He also discovered that although an inmate, Johnny Johnson, witnessed the incident while seated on a bench in the booking area, he previously was not contacted for a statement during the initial investigation.[1] Randall concluded that policy violations occurred and protocol was not followed properly, because Hardy did not accurately describe the force he used or all the persons who witnessed the incident. In a written warning issued by Randall to Officer Pickard (the author of the first investigation report), Pickard was charged with violating policy and procedure during her investigation. Randall concluded that he found "a substantial amount of evidence that show excessive force was used. Both officers (Hinton and Flowers) admitted they saw no reason for Hardy to use force. They also admitted they had Detainee

---

[1]This report refers to the inmate's name as Johnny Bill Johnson. At the hearing, Defendant introduced booking sheets of Johnny Bill Johnson and Johnie Ray Johnson, and Defendant Hardy identified the inmate present in a video from March 12, 2012, as Johnie Ray Johnson. The Court is unclear about the relevance of this, since in an audio interview which the court refers to later in this opinion, Randall states that he witnessed an inmate identified as Johnny Dale Johnson on a video and later interviewed him about what he witnessed on that date.

Jessie Garrett under control when Hardy used force against him." Plaintiff's Exh. 1.

Randall further testified that during the course of his investigation he found that some segments of the officers' statements in the computer were deleted, and the officers also told him that statements were added to their reports which were not in the originals. He was not aware of any injuries suffered by Plaintiff as a result of the incident, as none were mentioned during his investigation. Randall reviewed a letter he received from another officer at the Jail, Sgt. Gary Andrews, who stated that he talked with Garrett, Flowers, and Hinton about the incident and that Flowers and Hinton agreed that Plaintiff "was placed against the wall." Plaintiff's Exh. 2. According to the letter, when Hardy's original report did not include that fact, Andrews reported that to his supervisor, Pickard, who told Hardy to re-write his report to include more details. Id. Later, Flowers told Andrews that the words in his report were changed and that the report was "tweaked." Id.

### 3. Brianne Pickard

Ms. Pickard formerly was employed as a lieutenant at the Jail in the area where Plaintiff Garrett was housed. She initially investigated the grievance Plaintiff filed about the incident, but was not present at the Jail on the date of the incident. After speaking with Hinton, Flowers and Hardy, and briefly to Plaintiff, she initially concluded that no excessive force was used. She stated Hardy did not mention a use of force in his original statement. In addition, Plaintiff did not mention an injury in his grievance, and she did not recall Plaintiff telling her he was injured, although she did recall that Plaintiff complained about shoulder pain during a previous stay at the Jail. She is aware of Jail policies governing excessive force, which can be based on several factors, such as the facts, environment, and behavior of the detainee.

### 4. Patricia Winter

Ms. Winter is employed as a LPN at the Jail, and vaguely remembers the March 12, 2012 incident. She remembers that Plaintiff suffered from a shoulder injury – a separated AC – and had been treated for it by a physician at least a year prior to the incident. She also stated Plaintiff was on a regular medication regimen at the Jail, and she occasionally saw him for medical requests. On the day of the incident, she talked with him while in the restraint chair, and she does not recall that he complained about any injuries at that time.

### 5. Darrell Flowers

Flowers is employed as a detention officer at the Jail, and recalls the incident. He and officers Hinton and Hardy were conducting cell checks when Plaintiff Garrett told them he felt suicidal. Officer Hardy upset Plaintiff when he asked him what he meant, and whether he intended to cause himself harm. Hinton then placed Plaintiff in cuffs and they escorted him downstairs. Plaintiff complained in the elevator that Hardy pushed him, but Hardy did not push him. Plaintiff yelled at Hardy and as they approached the booking bench, he knelt on the bench. Hinton uncuffed Plaintiff's left hand and Hardy held Plaintiff's right hand, which was still cuffed. Flowers stood behind Hinton at this time. Plaintiff looked back and forth between Hinton and Hardy, tensed his arms and clenched his right hand into a fist. Plaintiff stated, "the first chance I get," and then made the statement about Hardy's wife. Hardy pushed Plaintiff against the glass, causing him to hit his head. Later, when the officers took Plaintiff upstairs to the padded room, he told Flowers that the first chance he got, he would hit Hardy. See also Flowers' statement following the incident, Defendant's Exh. 1. Flowers further testified that there was no reason for Hardy to use force or to push Plaintiff up against the glass.

### 6. Kervin Hinton

Mr. Hinton also is employed as a correctional officer at the Jail. He was present on the day of the incident, and stated that Flowers initially placed Plaintiff in handcuffs prior to escorting him to the elevator. He recalls Plaintiff asking Hardy if he pushed him, and recalls Hardy responding he did not. Once they reached downstairs, Hinton held Plaintiff's left arm and removed the handcuff and Hardy held his right arm. Plaintiff turned back and forth between the two and Hinton asked Plaintiff to focus on him. At that point, Plaintiff Garrett made a statement about Hardy's wife, and Hinton then heard a bump, when Plaintiff's face hit the glass of the booking area. Although he could not really see the entire incident, Hinton agreed with Plaintiff that he "more or less did a face dive into the glass." He also stated that on a scale of one to ten, the amount of force used was a "2." Plaintiff did not complain about his shoulder and did not complain that he suffered injuries after the incident.

Hinton first wrote his report on March 13, 2012, but revised it on March 16, 2012, after Capt. Randall told him to revise it and include more detail. At trial, Hinton denied that he initially cuffed Plaintiff, even though he included that fact in his written statement. In his statement, Hinton stated Hardy "genlty (sic) placed" Plaintiff on the glass to keep control, and that Plaintiff continued to be "non-compliant." Defendant's Exh. 2. Hinton knew Plaintiff before the incident, never saw him assault an officer, observed him as getting along with most officers, and testified that there was no need for the use of force at the time of this incident. He did recall Plaintiff mentioning shoulder problems in the past.

### 7. Defendant Michael Hardy

Hardy formerly was employed at the Jail as a sergeant. He was unaware of his wife's affair

at the time of Plaintiff's statement, but did not allow his feelings to enter into his actions. He knew Plaintiff took medications and he scheduled Plaintiff for visits with a counselor. When Plaintiff told him on March 12, 2012, that he was feeling suicidal, he asked Plaintiff **how** he was feeling suicidal, because the policies require the officers to contact a nurse in such instances. He did not know Plaintiff suffered from a shoulder injury, but stated that during the incident Plaintiff commented that something was wrong with his shoulder. He stated he placed Plaintiff against the glass because he tensed up and stared him down, and he felt threatened. He denied that he saw any other witnesses in the booking area during the incident.

### 8.    Videos

At the beginning of the Hearing, Plaintiff stated he was provided copies of videos which recorded the incident at issue, but was not able to view those videos while incarcerated at the ADC. Defendant's counsel brought the same videos to the hearing and offered to play them for the court.

Four scenes are depicted in Plaintiff's Exhibit 6. The first scene showed the officers escorting Plaintiff off the elevator. The second scene showed a view of the control room from the inside, through which shadows of persons on the outside could be seen occasionally. However, the incident about which Plaintiff complains was not visible. The third scene showed Defendants escorting Plaintiff from the elevator on the second occasion, after they had taken him to the padded cell. The fourth scene showed Defendants placing Plaintiff in the restraint chair following the incident.

Plaintiff's Exhibit 7 contains two audio recordings of interviews with officers Flowers and Hinton conducted by Officer Randall during his investigation into Plaintiff's grievance, together

with two video interviews of officer Hardy. The following is a synopsis of those interviews:[2]

        a)        March 28, 2012, audio interview with Darrell Flowers:

On March 12, 2012, while conducting cell checks, detainee Plaintiff Garrett told Officers Flowers, Hinton and Hardy he felt suicidal. The protocol of the Jail in that situation is that an officer should cuff the detainee, immediately take him to the bench in booking, cuff him to the bench, and call the nurse. However in this instance, Hardy asked Plaintiff questions, such as how he was feeling suicidal and whether he intended to do bodily harm. The two went back and forth for a while and then Hardy ordered Plaintiff to pack his property, which also was not normal protocol. While transporting Plaintiff in the elevator to take him downstairs, Plaintiff repeated that Hardy hurt him and twisted his arm. Flowers did not witness this, but was aware that Plaintiff had a previous injury to his shoulder.

Once they reached the booking area, Plaintiff approached the bench and knelt on it, which was a typical act if an inmate was in leg restraints. (However, no one testified that Plaintiff was in leg restraints.) At this point, he faced the wall, but remained focused on Hardy and stared at him. Hinton had control of Plaintiff's left arm, and Hardy had control of the right arm, and Hardy then placed Plaintiff up against the glass wall. Flowers heard Plaintiff's head hit the glass "pretty good." After that, Plaintiff was re-cuffed and taken to cell 211. Flowers stated Plaintiff thought Hardy was playing games with him.

Flowers stated that when Plaintiff initially was placed on the bench, the officers had him under control, and Plaintiff's head was not placed against the glass until after the comment about Hardy's wife. Flowers told Randall that he originally wrote his report three times, because after

---

[2]Defendant did not object to the introduction into evidence of these interviews.

both the first and second time, the report was deleted, even though he had saved it.  He also admitted he initially left some facts out of his report, and agreed that any threats made by Plaintiff to Hardy occurred after he was placed up against the wall.  He stated that although he referred to "threats" in his statement, Plaintiff just yelled and made comments to Hardy about his wife, but did not threaten him.

         b)  March 28, 2012, audio interview with Kervin Hinton:

On March 12, 2012, Officers Hinton, Flowers and Hardy were conducting cell checks when Plaintiff Garrett told them he felt suicidal.  The Jail protocol was to take him to the bench and contact the nurse, but Hardy asked him questions, such as what was going on.  Plaintiff responded that he should check his record, and showed him his arms, since he had been suicidal in the past.  Hardy told Plaintiff to get his property, which was not usual protocol.  The officers took Plaintiff to the booking area.  On the elevator, Plaintiff was upset because he did not think Hardy believed him.  Hinton did not see any pushing and did not hear Plaintiff complain he was pushed.  When they arrived to the booking area, Plaintiff knelt in the bench, so that the officers could remove his cuffs.  Hinton took the left cuff off and as Hardy began to take the right cuff off, Plaintiff tensed up.  At this point, Flowers was in the middle behind Plaintiff.  The officers had control of Plaintiff at this point, and Plaintiff kept looking back at Hardy.  Hinton never personally thought Plaintiff was out of control, and did not hear any threats, only comments about Hardy's wife.  Then Plaintiff's head was pushed into the glass.  On a scale of one to ten, the force used was about a 2, with no injury and no complaints of injury.

At this point in this interview, Randall confronts Hinton, stating that he saw the video of the incident, and that Plaintiff's head hitting the wall was "not a two."  Hinton admits that although the

incident did not seem to be that bad, he and Flowers looked at each other when it happened, as if they were shocked by it, because they believed Plaintiff was under control.  Hinton also told Andrews and Pickard (the Jail employees who conducted the first investigation) that they had Plaintiff under control.  He admits that any threats made by Plaintiff occurred after Hardy pushed his head into the wall.

                              c)       May 2, 2012 video interview of Defendant Michael Hardy:

On March 12, 2012, he was conducting cell checks when Plaintiff told him he felt suicidal.  Although the protocol was to take an inmate to the bench, and not ask questions, Hardy felt it was okay to ask Plaintiff questions to determine his mental state.  He then told Plaintiff to get his property, and when he refused, the other officers gathered his property.  Hardy did not look at Plaintiff's arms, and did not push him out of the elevator, despite Plaintiff's claim to the contrary.  Plaintiff knelt on the bench, facing the wall, while Hardy uncuffed his left hand.  Hinton then held his left hand, and as Hardy tried to uncuff his right hand, Plaintiff tensed up and looked at Hardy.  Hardy then leaned Plaintiff up against the wall.  Plaintiff got loud and cursed, and the officers re-cuffed him and took him to cell 211.

Hardy stated that when Plaintiff kept looking at him, he was afraid he was going to spit on him, so he placed his head against the glass wall.  He did not use force and Plaintiff did not hit the glass.  He admitted that the two other officers reported that he was "in his feelings," but denied that he allowed his feeling to obstruct his judgment.  He estimated that the distance from the bench to the wall was about a foot and a half.  In the interview, he told Randall that Plaintiff made the comment about his wife **after** he placed him on the wall, but Randall showed him his written statement, where he said that the comment was made **before** the incident.  Hardy stated that he

honestly felt that Plaintiff was a threat based on his body language. He also admitted that he did not follow protocol, although he knew Plaintiff was suicidal. At this point, Hardy offered to take a lie detector test and the interview ended.

d) May 24, 2012 video interview with Defendant Michael Hardy:

During this interview, officer Randall confronted Hardy with the results of the lie detector test, which concluded that Hardy did not tell the truth when he denied that he forcibly slammed Plaintiff into the glass wall.[3] At this point Randall also told Hardy that a video he reviewed showed the presence of an inmate witness, Johnny Dale Johnson, who was not noted in Hardy's statement. Randall interviewed Johnny Johnson, who confirmed Plaintiff's version of the events, and also told him about a prior incident involving Plaintiff and Hardy, in November, 2011, when Hardy similarly slammed Plaintiff's head into a window or wall. Randall was unable to locate any written statements about that incident and Hardy denied the use of force.

### 9. Other Exhibits

Policies and Procedures of the Jail governing the treatment of pretrial detainees were introduced as Plaintiff's Exhibit 3. Copies of Plaintiff's medical records, which reflect treatment for mental issues and a mild AC separation of his left shoulder, are Plaintiff's Exhibit 4. Included in that Exhibit is a "Notice of Termination," dated May 29, 2012, directed to Defendant Hardy by the Faulkner County Sheriff's Office, based on the incident involving the Plaintiff at the Jail. Id.

## III. Legal Conclusions

---

[3] The Court includes this portion only as evidence of the interview, and will not consider the lie detector result when rendering conclusions of law.

### A. Policy Violations

Plaintiff's allegations of Jail policy violations by Defendant Hardy do not support a constitutional claim. Williams v. Nix, 1 F.3d 712, 717 (8th Cir. 1993).

### B. Excessive Force

Claims filed by pretrial detainees are analyzed under the Fourteenth Amendment due process clause. Bell v. Wolfish, 441 U.S. 520, 535 (1979). Courts look to whether the Defendant's actions were objectively reasonable under the circumstances. Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994). "The question for the [factfinder] is whether, judging from the perspective of a reasonable officer at the scene..., the totality of the circumstances justifies the use of the force used." Moore v. Novak, 146 F.3d 531, 535 (8th Cir. 1998), quoting Foster v. Metropolitan Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990). In addition, evidence of only de minimis injury does not necessarily foreclose an excessive force claim under the Fourth Amendment. Chambers v. Pennycook, 641 F.3d 898 (8th Cir. 2011). While the "degree" of injury is relevant to the amount and type of force used, "it is logically possible to prove an excessive use of force that caused only a minor injury, and a rule that forecloses a constitutional claim in that circumstance focuses on the wrong question." Id., 641 F.3d at 906. Rather, the focus should be on "whether the force applied is reasonable from the perspective of a reasonable officer on the scene at the time the force is used." Id.

The video of the officers escorting Plaintiff from the elevator does not show any excessive force by Defendant Hardy. Although Plaintiff complained that Hardy pushed him, the video shows merely that Hardy's hand was behind Plaintiff's back in an effort to guide him through the elevator and down the hallway. Unfortunately, however, the video does not show the main incident between

the Plaintiff and Defendant. The Court finds credible, however, the Plaintiff's version of the events in the booking area. Plaintiff's testimony that Hardy shoved him in the glass was corroborated by Officers Hinton and Flowers, who both testified that no force was necessary at the time, and that Plaintiff was under control when Hardy slammed him into the glass window. Those conclusions also were repeated in the audio interviews with John Randall, and in the conclusion reached by Randall in the warning report issued to officer Pickard. The Court did not find Defendant Hardy to be credible, based on his limited version of the events during his testimony at the Hearing, and his interviews with John Randall. Therefore, the Court finds Plaintiff proved by a preponderance of the evidence that the force used by Defendant Hardy against him on March 12, 2012, was unreasonable and excessive.

Aside from his complaint of a sore shoulder, Plaintiff does not provide any evidence of having suffered a compensable injury from the incident. Although he testified about a shoulder injury prior to the incident, and that Defendant Hardy's actions hurt his shoulder, he provided no medical or other evidence to support a finding of injury. The medical records introduced into evidence reflected Plaintiff's medical treatment **prior** to the incident, and Nurse Winter testified that when she saw Plaintiff after the incident, he did not complain to her about suffering any injuries. Therefore, the Court finds that Plaintiff is entitled to nominal damages only, in the amount of one dollar. See Corpus v. Bennett, 430 F.3d 912, 916 (8th Cir. 2005), where the court stated that "one dollar is recognized as an appropriate value for nominal damages." In addition, however, the Court finds that Defendant Hardy is liable to Plaintiff for the $350 cost associated with filing this action, pursuant to FED.R.CIV.P. 54(d). "This rule represents a codification of the 'presumption that the prevailing party is entitled to costs,'" recognizing that "the district court has substantial discretion

in awarding costs to a prevailing party." <u>Greaser v. State Dep't. Of Corrections</u>, 145 F.3d 979, 985 (8th Cir. 1998), quoting <u>Bathke v. Casey's General Stores, Inc.</u>, 64 F.3d 340, 347 (8th Cir. 1995).

**IV.     Conclusion**

IT IS, THEREFORE, RECOMMENDED that Plaintiff shall have Judgment on his claim against Defendant in the amount of $1 in nominal damages and $350 in costs.

IT IS SO RECOMMENDED this 27th day of August, 2013.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE